[No. S006168. Jan 29, 1990.]

SOUTHERN CALIFORNIA GAS COMPANY, Plaintiff and Appellant, v.
PUBLIC UTILITIES COMMISSION, Defendant and Respondent.

---

**COUNSEL**

Leslie E. LoBaugh, Jr., Thomas D. Clarke, Woodrow D. Smith, Glen J. Sullivan, Robert B. Keeler and David C. Keitel for Plaintiff and Appellant.

O'Melveny & Myers, Ralph J. Shapira, Hufstedler, Miller, Kaus & Beardsley, Shirley M. Hufstedler, Ronald A. Zumbrun, Anthony T. Caso, Loeb & Loeb and Fred B. Griffin as Amici Curiae on behalf of Plaintiff and Appellant.

Janice E. Kerr, Michael B. Day and Carol Dumond for Defendant and Respondent.

---

**OPINION**

**BROUSSARD, J.**—In this proceeding we are called upon to determine whether the California Public Utilities Commission (the commission) erred in concluding that Southern California Gas Company (SoCalGas) has impliedly waived its attorney-client privilege in this proceeding to recover the cost of certain fuel expenditures. (Cal.P.U.C. Dec. No. 87-12-071; as modified by Cal.P.U.C. Dec. No. 88-06-029.) We conclude that it has erred, and we vacate the commission's order that SoCalGas produce the privileged documents or withdraw its application.

## FACTS

In 1978, SoCalGas entered into a long-term gas supply contract with the predecessor in interest to Getty Synthetic Fuels, Inc. (Getty). Under the terms of the contract, SoCalGas agreed to purchase gas as long as Getty could produce economically viable quantities from a landfill in Monterey Park, California. In 1983, the terms of the contract called for the price of the gas to be determined by a "cost-plus" formula that required SoCalGas to pay prices that were much higher than other sources of gas available to it.

On August 23, 1984, in an informal phone conference between several representatives of SoCalGas and the commission, SoCalGas explained why the contract with Getty was undesirable and "requested permission" from the commission to negotiate a buyout to escape from the contract. In response to a question from the commission, SoCalGas stated that its attorneys had looked over the contract and found no way that SoCalGas could unilaterally terminate the contract without being subject to liability. The commission's staff members approved the negotiations. In February 1986, SoCalGas negotiated a buyout of the contract for $7.4 million.

On March 21, 1986, SoCalGas submitted an informal advice letter to the commission seeking approval of the buyout agreement.[1] In this letter, SoCalGas noted that it had consulted SoCalGas legal staff prior to negotiating the agreement and that "staff indicated its concurrence with the plan." In response, the commission's Division of Ratepayer Advocates (DRA)[2] sent a data request to SoCalGas on June 9, 1986, seeking, among other information, the identity of staff consulted, the basis of staff's concurrence, and copies of notes and memoranda taken in preparing for or summarizing any meetings regarding the negotiations. SoCalGas abandoned this informal procedure when the commission would not approve its buyout without the information from its attorneys.

In September 1986, SoCalGas applied for a consolidated adjustment mechanism (CAM) proceeding to determine that its buyout was prudent and reasonable. In this proceeding SoCalGas sought the commission's authorization to recover its purchased gas costs and a finding from the commission that its gas purchases were reasonable.[3] The commission questioned

---

[1] This procedure is one in which no hearings are held and no formal testimony is submitted.

[2] The DRA, created by the commission pursuant to Public Utilities Code section 309.5, is the consumer advocate division of the commission and generally appears as a utility's opponent in commission proceedings. The DRA was named the Public Staff Division when SoCalGas initiated this proceeding, but for purposes of consistency we shall refer to the division by its new name.

[3] The CAM procedure is authorized by the commission pursuant to Resolution No. G-2406, issued January 6, 1981. A utility may recover all costs which the commission

the reasonableness of the buyout because it believed that Getty may have been in breach of the contract and that SoCalGas could have terminated the contract without having to negotiate the $7.4 million buyout.[4]

The DRA requested discovery of documents with any legal analyses regarding early termination of the Getty contract. SoCalGas identified 15 confidential memos written by its attorneys, but refused to disclose them on grounds of the attorney-client privilege. SoCalGas stated that it would not rely on advice of counsel as a justification for its decision to buy out the Getty contract. Nonetheless, the presiding administrative judge ordered SoCalGas to produce the documents for an in camera review. SoCalGas refused to comply and appealed the judge's order to the full commission.

In December 1987, the commission decided that SoCalGas had impliedly waived the attorney-client privilege and ordered it to submit the documents in question to an administrative judge other than the one presiding in the matter for an in camera review or to withdraw its application to recover the cost of its expenditures.[5] (Cal.P.U.C. Dec. No. 87-12-071.) The commission did not determine whether the attorney-client privilege applied in its CAM proceedings. It concluded that there is "little guidance in statute and case law by which we can determine to which of our proceedings or activities the privilege is meant to apply and to which of them it is not."[6] (Cal.P.U.C. Dec. No. 87-12-071, p. 40.) The commission determined that even if the privilege applied, an implied waiver arose from SoCalGas's CAM application under the specific facts of this case. On June 18, 1988, the commission issued an order (Cal.P.U.C. Dec. No. 88-06-029) that modified its December decision to clarify its reasoning and deny rehearing. We granted review of that order and conclude the attorney-client privilege does apply in this proceeding, and SoCalGas has not waived its privilege.

---

determines to be reasonable and prudent by adjusting rates paid by its customers. If the commission determines that any costs were not reasonably incurred, it orders the utility to make an adjustment to reduce rates prospectively or make a refund to its ratepayers.

[4] In particular, the commission contends that the contract called for gas with an absolute minimum heating value of 970 BTU/cf and that the gas supplied by Getty frequently fell below this standard. In addition, the commission alleges that Getty may have violated the contract's provision regarding contaminants in the gas and that SoCalGas was aware of the contaminants, but continued to honor the contract.

[5] We note that one commissioner, Commissioner Duda, dissented from the commission's holding.

[6] When the commission modifies a decision, it does not issue a consolidated decision. In its brief, the commission has attached a consolidated opinion which incorporates the modifications in Cal.P.U.C. Dec. No. 88-06-029. All citations to the commission's decision will be to the December decision with the modifications incorporated in it from the June decision.

## I. *Applicability of Attorney-client Privilege*

The attorney-client privilege, codified in Evidence Code section 954, provides in pertinent part: "Subject to Section 912 and except as otherwise provided in this article, the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer. . . ." The attorney-client privilege has been a well established part of Anglo-American jurisprudence for over 400 years. (McCormick, Evidence (2d ed. 1972) § 87, pp. 175-179.) It has been part of California statutory law in one form or another since 1851. (See Cal. Civil Practice Act, Stats. 1851, ch. 5, §§ 395-399, p. 114.) ▪ As this court has previously noted, "the privilege seeks to insure 'the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense.' " (*Mitchell* v. *Superior Court* (1984) 37 Cal.3d 591, 599 [208 Cal.Rptr. 886, 691 P.2d 642], citing *Baird* v. *Koerner* (9th Cir. 1960) 279 F.2d 623, 629.) If a lawyer could not promise to maintain the confidentiality of his client's secrets, the only advice he or she could provide would be, " 'Don't talk to me.' " (*Welfare Rights Organization* v. *Crison* (1983) 33 Cal.3d 766, 771, fn. 3 [190 Cal.Rptr. 919, 661 P.2d 1073, 31 A.L.R.4th 1214].) Application of the privilege will occasionally shield relevant information which may very well create obstacles for the party seeking the privileged information; however, the Legislature and the courts of this state have determined that the party's concern is "outweighed by the importance of preserving confidentiality in the attorney-client relationship." (*Mitchell* v. *Superior Court, supra*, 37 Cal.3d at p. 599.)

▪▪▪▪ The United States Supreme Court has commented on the importance of the privilege in a regulatory setting.[7] In *United States* v. *Louisville & Nashville Railroad Co.* (1915) 236 U.S. 318, 336 [59 L.Ed. 598, 606-607, 35 S.Ct. 363], the Interstate Commerce Commission (ICC) sought to examine confidential communications between the railroad and its lawyers, based on its power to examine records and correspondence pursuant to the Interstate Commerce Act. The court rejected the ICC's position, stating: "The desirability of protecting confidential communications between attorney and client as a matter of public policy is too well known and has been too often recognized by text-books and courts to need extended comment now. If such communications were required to be made

---

[7]Corporations, including publicly regulated industries, come within the protection of the attorney-client privilege. (See *Upjohn Co.* v. *United States* (1981) 449 U.S. 383 [66 L.Ed.2d 584, 101 S.Ct. 677]; *D. I. Chadbourne, Inc.* v. *Superior Court* (1964) 60 Cal.2d 723, 732 [36 Cal.Rptr. 468, 388 P.2d 700]; *Hoiles* v. *Superior Court* (1984) 157 Cal.App.3d 1192 [204 Cal.Rptr. 111].)

the subject of examination and publication, such enactment would be a practical prohibition upon professional advice and assistance." (*Ibid.* [59 L.Ed.2d at p. 607]) The court's ruling in *Louisville & Nashville Railroad Co., supra,* is particularly relevant to the instant proceedings because the commission, as did the ICC in *Louisville & Nashville Railroad Co.,* claims its investigatory powers may permit it to examine confidential communications between a regulated company and its attorneys.

■ There is no indication in the relevant statutes that the privilege is limited to judicial proceedings. On the contrary, it is evident that the privilege applies in the administrative law setting. Evidence Code section 910, which codifies the scope of several evidentiary privileges including the attorney-client privilege, provides: "Except as otherwise provided by statute, the provisions of this division apply in *all proceedings.* The provisions of any statute making rules of evidence inapplicable in particular proceedings, . . . do not make this division inapplicable to such proceedings." (Italics added.) Evidence Code section 901 defines a "proceeding" to include "any action, *hearing, investigation,* inquest, or inquiry (whether conducted by a court, *administrative agency,* hearing officer, arbitrator, legislative body, or any other person authorized by law) in which, pursuant to law, testimony can be compelled to be given." (Italics added.)[8]

We agree with the comment of the district court in *Civil Aeronautics Board* v. *Air Transport Association of America* (D.D.C. 1961) 201 F.Supp 318, that when an agency has the power to compel testimony, its power must be tempered by the attorney-client privilege, unless there is unambiguous statutory directive to the contrary. Although the commission is granted broad powers under the Constitution,[9] no provision exempts it from

---

[8] The rationale for this broad application of the attorney-client privilege can be gleaned from the Law Revision Commission's comments to section 910, which provide in pertinent part: "If confidentiality is to be protected effectively by a privilege, the privilege must be recognized in proceedings other than judicial proceedings. The protection afforded by a privilege would be insufficient if a court were the only place where the privilege could be invoked. Every officer with power to issue subpoenas for investigative purposes, every administrative agency, every local governing board, and many more persons could pry into the protected information if the privilege rules were applicable only in judicial proceedings.

"Therefore, the policy underlying the privilege rules requires their recognition in all proceedings of any nature in which testimony can be compelled by law to be given. Section 910 makes the privilege rules applicable to all such proceedings." (Cal. Law Revision Com. com., Deering's Ann. Evid. Code (1986 ed.) § 910, p. 69.)

[9] The commission, pursuant to California Constitution article XII, section 2, is authorized to adopt its own procedures for conducting hearings and investigations subject to statute and due process. In addition, the commission has the power to examine records, take testimony, and punish for contempt. (Cal. Const., art. XII, § 6.) The court has held on other occasions that the commission's powers enumerated in article XII, are subject to limitation by statute. (See *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836 [157 Cal.Rptr. 676, 598 P.2d 836]; *Southern Cal. Gas Co.* v. *Public Utilities Com.* (1979) 24 Cal.3d 653 [156

complying with the statutory attorney-client privilege.[10] We conclude that the commission's powers pursuant to the state Constitution in this context are subject to the statutory limitation of the attorney-client privilege.

II.  *Waiver of the Attorney-client Privilege*

(A)  *Nonstatutory Waiver*

■   The scope of this court's review of a Public Utilities Commission decision is limited: " 'The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State.' " (*City and County of San Francisco* v. *Public Utilities Com.* (1985) 39 Cal.3d 523, 530 [217 Cal.Rptr. 43, 703 P.2d 381] [citing to Pub. Util. Code, § 1757]; accord *Toward Utility Rate Normalization* v. *Public Utilities Com.* (1978) 22 Cal.3d 529, 537 [149 Cal.Rptr. 692, 585 P.2d 491].) Thus, we must decide whether the commission exceeded the scope of its authority when it decided that SoCalGas's application necessarily waived its attorney-client privilege.

■   The commission determined that SoCalGas had impliedly waived the attorney-client privilege by putting advice of counsel at issue. It reasoned that before SoCalGas could recover the cost of its expenditures, it had the burden of proving by clear and convincing evidence that its expenditures were reasonable. The test it normally applies to determine the prudence of a utility's expenses is: "In light of all the information that the utility's decision makers knew or should have known at the time, was the decision a reasonable one?" (Cal.P.U.C. Dec. No. 87-12-071, p. 31.) The commission determined that SoCalGas's CAM application placed in issue the reasonableness of its decision to buy out the contract, and that SoCalGas could not have made this decision prudently without considering legal

Cal.Rptr. 733, 596 P.2d 1149]; *Southern Cal. Gas Co.* v. *Public Utilities Com.* (1985) 38 Cal.3d 64 [211 Cal.Rptr. 99, 695 P.2d 186].)

   [10]In the proceeding before the commission, the DRA cited various statutes that authorize the commission to investigate, and it contended that these statutes may impliedly create an exemption for the commission from having to comply with the attorney-client privilege. (See Pub. Util. Code, §§ 313, 314, 463, subd. (b), 582.) The commission found that none of the above statutes specifically exempted the commission from the attorney-client privilege, but it expressed uncertainty as to whether these statutes create an implied statutory exemption from the attorney-client privilege. (Cal.P.U.C. Dec. No. 87-12-071, p. 22.) Although the above statutes grant the commission broad investigatory powers, we conclude in the absence of language creating a specific exemption to the privilege, the Legislature enacted these provisions under the assumption that the attorney-client privilege applied. (See *Welfare Rights Organization* v. *Crison, supra*, 33 Cal.3d 766, 771; *Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41 [69 Cal.Rptr. 480].)

advice because legal concerns are an essential consideration when determining a reasonable means of terminating a contract. The commission held, therefore, that under the facts of this case SoCalGas had impliedly waived the attorney-client privilege by putting the reasonableness of its lawyers' advice at issue. The commission also noted that "[i]t is not SoCalGas's application alone that waives the privilege here; it is the fact that we see no basis for finding SoCalGas's choice of buyout reasonable, other than advice of counsel." (Cal.P.U.C. Dec. No. 87-12-071, p. 35.)

SoCalGas challenges the commission's finding of implied waiver. It argues that it does not rely on advice of counsel as justification for its actions and that the communications which the commission seeks are not necessary to a fair adjudication of this proceeding. In addition, SoCalGas contends that any alleged failure on its part to make an adequate showing of prudence does not constitute a ground for finding that it impliedly waived its privilege.

The court in *Merritt* v. *Superior Court* (1970) 9 Cal.App.3d 721 [88 Cal.Rptr. 337] was the first in California to recognize the theory of an implied waiver of the attorney-client privilege under the common law. The apparent rationale for this implied nonstatutory waiver has been explained as follows: " 'The Evidence Code does *not* create any exception to the lawyer-client privilege for the situation in which a client *tenders* an issue such as his lawyer's conduct or state of mind. But the Code does *not* bar the courts from creating by decisional law *new* exceptions to various privileges.' " (*Chicago Title Insurance Co.* v. *Superior Court* (1985) 174 Cal.App.3d 1142, 1149, fn. 8. [220 Cal.Rptr. 507], quoting 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 40.3, p. 1467 (italics in original).) Applying this reasoning, the court in *Merritt* held that plaintiff had impliedly waived his privilege since he had specifically put the state of mind of his attorney at issue by alleging that the defendant's attorney had confused his attorney and impeded his attorney's ability to settle his claim. (*Merritt* v. *Superior Court, supra,* 9 Cal.App.3d at p. 730.)

We recognized this theory of an implied waiver in *Mitchell* v. *Superior Court, supra,* and established that the person or entity seeking to discover privileged information can show waiver by demonstrating that the client has put the otherwise privileged communication directly at issue and that disclosure is essential for a fair adjudication of the action. (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d at p. 609.) In *Mitchell,* several plaintiffs filed suit seeking damages for emotional distress against various entities involved with chemicals which plaintiffs alleged contaminated air and ground water around their homes. One defendant sought discovery of information or documents a plaintiff received from her attorneys about one of

the chemicals. Plaintiff invoked the attorney-client privilege and refused to comply. The trial court determined that by seeking damages for emotional distress plaintiff put the information from her attorneys at issue and waived her privilege since it was essential to establish the reasonableness or genuineness of her claim. We disagreed, saying that she had not put communications with her attorney at issue, but rather the reasonableness of her fears about the chemical. We concluded there is no "waiver of the attorney-client privilege where the substance of the protected communication is not itself tendered in issue, but instead simply represents one of several forms of indirect evidence in the matter." (*Id.* at p. 606.)

Similarly, in *Aetna Casualty & Surety* v. *Superior Court* (1984) 153 Cal.App.3d 467 [200 Cal.Rptr. 471], the court found no implied waiver of the privilege. In *Aetna* an insurer filed an action seeking declaratory relief, alleging that its policy provided no coverage for the insured's claim. The insured cross-complained, alleging Aetna's bad faith denial of insurance coverage. The insured sought discovery of Aetna's communication with its attorneys, alleging that Aetna waived its privilege because Aetna was using advice of counsel as a defense and that Aetna's state of mind was at issue. The court held that Aetna had not impliedly waived its attorney-client privilege since it was not relying on advice of counsel to show that it acted reasonably, but instead sought to show that its conduct was reasonable based on the underlying facts. Moreover, the court held that the fact that Aetna's state of mind was at issue in the insured's bad faith action did not place in issue its attorneys' state of mind or their advice. (See *Transamerica Title Ins. Co.* v. *Superior Court* (1987) 188 Cal.App.3d 1047 [233 Cal.Rptr. 825]; *Estate of Kime* (1983) 144 Cal.App.3d 246 [193 Cal.Rptr. 718]; *Schlumberger Limited* v. *Superior Court* (1981) 115 Cal.App.3d 386 [171 Cal.Rptr. 413]; *Miller* v. *Superior Court* (1980) 111 Cal.App.3d 390 [168 Cal.Rptr. 589].)

Federal courts have applied a standard similar to our own for determining whether a party has impliedly waived a privilege. (See *Afro-Lecon, Inc.* v. *U.S.* (Fed. Cir. 1987) 820 F.2d 1198, 1205; *Chase Manhattan Bank* v. *Drysdale Securities Corp.* (S.D.N.Y. 1984) 587 F.Supp. 57, 58, citing *Hearn* v. *Rhay* (E.D.Wash. 1975) 68 F.R.D. 574, 581.)[11] In *Transcontinental Gas*

---

[11] The federal standard for determining whether a client has impliedly waived its attorney-client privilege is generally stated as follows: " '(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information *vital* to his defense. Thus, where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct.' " (*Chase Manhattan Bank* v. *Drysdale Securities Corp., supra*, 587 F.Supp. at p. 58, italics added.)

*Pipeline Corp.* (1987) 38 F.E.R.C. [¶] 63,042, an administrative court of the Federal Energy Regulatory Commission applied the federal standard in a case with facts very similar to the instant matter, and held that a utility did not impliedly waive its attorney-client privilege by filing an action to recover the costs of its negotiated buyout and buydowns of "take or pay" contracts with its gas suppliers.[12] Interveners in that case had alleged that Transcontinental Gas Pipeline Corp. (hereinafter Transco) put the prudence of its contract negotiations at issue by filing its rate case and therefore it impliedly waived its attorney-client privilege as to any legal advice relevant to a determination of whether it acted prudently.[13] They argued that it was essential that they have access to the advice Transco received from its attorneys to present their case on prudence. The administrative judge determined that "while this information may be relevant, it is not vital to the development of their respective cases. Interveners are free to review the original and renegotiated contracts, as well as the data and studies which quantify Transco's potential liability under the original contracts. Interveners' counsel can review the contracts themselves and determine what legal defenses were available to Transco. Transco's attorneys' advice is not the sole source of legal evaluation of these contracts." (*Ibid.*)

■■■ SoCalGas has done nothing in the present proceedings to place in issue its privileged communications.[14] Nowhere in its CAM application or in the proceedings before the commission does SoCalGas state that it intends to rely on its attorneys' advice or state of mind to demonstrate that it acted reasonably when it bought out the Getty contract. It has expressly stated otherwise. Because its attorneys' advice or state of mind is not in issue, it has not impliedly waived its attorney-client privilege. (See *Aetna Casualty & Surety Co.* v. *Superior Court, supra,* 153 Cal.App.3d at p. 475; *Transamerica Title Ins. Co.* v. *Superior Court, supra,* 188 Cal.App.3d at p. 1053.)

Cases cited by the commission are distinguishable. We have already explained that *Merritt, supra,* 9 Cal.3d 721, is " 'limited in its application to the one situation in which a client has placed in issue the *decisions,*

---

[12] The Federal Energy Regulatory Commission is an agency that performs functions similar to those of the Public Utilities Commission on the federal level.

[13] The interveners opposed Transco's request for a rate adjustment in much the same manner as the DRA opposes SoCalGas in the present proceeding. Interveners against Transco included the Federal Energy Regulatory Commission's staff, the Brooklyn Union Gas Company, and the Public Service Electric and Gas Company.

[14] In the proceedings before this court, the commission additionally asserts that SoCalGas placed its privileged communications in issue when it disclosed in the informal phone conference that it had consulted its attorneys and that they had concluded that it could not unilaterally terminate the Getty contract. We note that SoCalGas's disclosures in the phone conference cannot be considered "a deliberate injection of the advice of counsel" (*Handgards, Inc.* v. *Johnson & Johnson* (N.D.Cal. 1975) 413 F.Supp. 926, 929), since SoCalGas has indicated no intent to rely on them in the present matter.

*conclusions, and mental state of the attorney who will be called as a witness to prove such matters.'* " (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d at 605, quoting *Estate of Kime, supra,* 144 Cal.App.3d 246, 259, italics added.) In *Handgards, Inc.* v. *Johnson & Johnson, supra,* 413 F.Supp 926, the court held that defendant impliedly waived its attorney-client privilege when it indicated its intent to call its attorneys as witnesses. The court stated that "[t]he deliberate injection of the advice of counsel into a case waives the attorney-client privilege as to communications and documents relating to the advice." (*Id.* at p. 929.) Neither case justifies the commission's determination that SoCalGas impliedly waived its privilege.[15]

Further, there is no evidence to indicate that the information SoCalGas claims is privileged is vital to a fair adjudication in this proceeding. According to the commission, in order for a utility to recover its expenditures, it must show that its expenses were reasonable. SoCalGas, therefore, has necessarily placed in issue the reasonableness of its decision to buy out the Getty contract. The commission correctly points out that a prudent decision on a method to legitimately terminate a contract depends on a legal analysis of that contract's validity. Although some legal analysis of the contract's enforceability will be necessary in order for the commission to assess the reasonableness of the buyout, the actual legal analysis provided by SoCalGas's attorneys is not essential for this determination. The issue is an objective one which does not depend on a particular attorney's analysis, but upon the terms of the contract itself and surrounding factual circumstances. (See *Transcontinental Gas Pipeline Corp., supra,* 38 F.E.R.C. ¶ 63,042.)

SoCalGas has represented that it will demonstrate that its buyout was reasonable based on an examination of the contract itself, the economic analysis it relied on to arrive at its decision, and testimony from appropriate

---

[15] In *Fremont Indemnity Co.* v. *Superior Court* (1982) 137 Cal.App.3d 554 [187 Cal.Rptr. 137], the court held that plaintiff had impliedly waived his constitutional privilege against self-incrimination because his testimony was "vitally relevant" to a fair resolution of his action. While discovery was proceeding in plaintiff's claim against his insurer to recover under a fire insurance policy, he was indicted for arson. Plaintiff asserted his constitutional privilege against self-incrimination and refused to give his deposition. The "[d]iscovery of this information was clearly essential to a fair resolution of the case, since a finding of arson would have provided a complete defense for defendant insurers." (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d at p. 605, referring to *Fremont Indemnity.*) As explained below, SoCalGas's legal advice is not essential for the commission to fairly adjudicate SoCalGas's CAM application.

The commission also cites to *Wilson* v. *Superior Court* (1976) 63 Cal.App.3d 825 [134 Cal.Rptr. 130] as support for its holding of an implied waiver. *Wilson* involved the judicially created privilege of confidentiality which attaches to personal income tax returns. (*Webb* v. *Standard Oil Co.* (1957) 49 Cal.2d 509 [319 P.2d 621].) In *Mitchell,* we specifically stated that *Wilson* is inapplicable when the privilege involved is a statutory one like the attorney-client privilege. (*Mitchell, supra,* 37 Cal.3d at p. 606, fn. 6.)

witnesses. (Cal.P.U.C. Dec. No. 87-12-071, p. 9.) After analyzing this information, the commission can determine what SoCalGas should have known regarding the contract's validity and decide whether SoCalGas's buyout of the contract was reasonable.[16] SoCalGas, therefore, can meet its burden of proof under the commission's standard without disclosing its actual legal advice. If the commission decides, after considering all of the above evidence, that SoCalGas has not adequately demonstrated its buyout was reasonable, the commission can disallow recovery of the expense. SoCalGas does not, however, impliedly waive its privilege if it simply fails to make an adequate showing that it acted reasonably.

The commission argues alternatively that the privileged information is essential for its review of SoCalGas's CAM application because, pursuant to various statutes and in fundamental fairness to ratepayers, it must be able to examine all relevant sources of information that SoCalGas considered before it bought out the Getty contract. We have concluded that an agency can compel disclosure of privileged information only when there is the clearest statutory authority. None of the statutes cited by the commission expressly requires it to have access to a utility's privileged sources of information in order to process a CAM application. Public Utilities Code section 454 provides in pertinent part that "no public utility shall change any rate . . . except upon a showing before the commission and a finding by the commission that the new rate is justified. . . ." This statute requires the utility to make a showing to justify a rate increase, but it makes no suggestion that the commission must have access to privileged information to determine if a rate increase is justified.[17]

While it is true that the commission, in fundamental fairness to SoCalGas's ratepayers, must make a careful effort to ascertain whether SoCalGas's expenses are reasonable, this effort does not have to come at the unnecessary expense of trampling on SoCalGas's attorney-client privilege. We rejected a similar argument in *Mitchell, supra,* 37 Cal.3d at page 608, in which we determined that it was not necessary that defendant have access

---

[16] In his dissenting opinion, Commissioner Duda noted that SoCalGas's actual legal advice is not essential since the commission will not only consider what SoCalGas actually knew, but what it should have known. He asserts the commission can determine the reasonableness of SoCalGas's buyout based on the legal advice SoCalGas should have considered.

[17] The commission also refers to Public Utilities Code section 463, subdivision (b), which provides in pertinent part that whenever a utility "fails to prepare or maintain records sufficient to enable the commission to completely evaluate any relevant or potentially relevant issue related to the reasonableness and prudence of any expense relating to the planning, construction, or operation of the corporation's plant, the commission shall disallow that expense for purposes of establishing rates for the corporation." Even if the commission can compel testimony or production of documents under this provision, the attorney-client privilege still applies absent a specific provision to the contrary.

to privileged sources of information the plaintiff considered to determine the issue of whether plaintiff's claim was reasonable and genuine.[18] SoCal-Gas's actual legal advice may be relevant information, but it is not essential. "Privileged communications do not become discoverable simply because they are related to issues raised in the litigation." (*Transamerica Title Ins. Co.* v. *Superior Court, supra*, 188 Cal.App.3d 1047, 1052-1053.)

If we were to uphold the commission's ruling, it would have the right to demand privileged information from a utility whenever a CAM application or any other application to recover costs involved a legal issue, since legal advice might be one source of information the utility considered. ■ ■ ■ ■ The commission's approach would drastically impinge on a utility's efforts to obtain adequate legal advice because a utility would be much less likely to divulge all pertinent information to its attorneys if it knew that the commission would have access to the communications.[19] "[T]he fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters." (*Mitchell* v. *Superior Court, supra*, 37 Cal.3d at p. 599.) Expanding the implied waiver of the attorney-client privilege in the manner suggested by the commission's holding would "'create an intolerable burden upon the . . . privilege, making it very difficult for the parties to the relationship to openly discuss matters which might eventually lead to litigation.'" (*Estate of Kime, supra*, 144 Cal.App.3d 246, 260, quoting *Miller* v. *Superior Court, supra*, 111 Cal.App.3d 390, 395.) "In a society as complicated in structure as ours and governed by law as complex and detailed as those imposed upon us, expert legal advice is essential." (*Transamerica Title Ins. Co., supra*, 188 Cal.App.3d at p. 1052.)

---

[18] Several appellate courts have rejected the argument that a client places his attorneys' communications at issue whenever the client's state of mind is at issue. (*Transamerica Title Insurance Co, supra*, 188 Cal.App.3d at pp. 1053-1054; *Aetna Casualty & Surety Co., supra*, 153 Cal.App.3d at pp. 476-477; *Miller* v. *Superior Court, supra*, 111 Cal.App.3d 390, 394.) Thus, even if the issue in this matter revolved around the state of mind of SoCalGas's managers rather than the reasonableness of the buyout of the Getty contract, SoCalGas did not place in issue its attorneys' advice or state of mind.

[19] We note that the commission's order is not any less intrusive because it only requires an "in camera" inspection of SoCalGas's privileged documents. The commission's order violates Evidence Code section 915 which provides that in the case of all privileges, other than the identity-of-informer, official information, or the trade secret privileges, the presiding officer may not require disclosure of information claimed to be privileged under this division in order to rule on the claim of privilege. In this instance, the commission's order not only would allow the presiding officer to identify whether documents are protected by the attorney-client privilege, but also would permit the commission to consider the relevance of the documents on the merits. There is no statutory or other provision that allows for such an inspection of documents allegedly protected by the attorney-client privilege.

(B) *Statutory Waiver*

Evidence Code section 912 establishes a statutory basis for determining when one has voluntarily waived the attorney-client privilege: whether the client claiming the privilege has disclosed or consented to a disclosure of a significant part of the communication.[20] The commission found the question whether SoCalGas expressly waived its privilege under section 912 of the Evidence Code to be a close one and concluded that "[b]ecause we have other and clearer grounds for finding an implied waiver, we decline to resolve the question of express waiver at this time." (Cal.P.U.C. Dec. No. 87-12-071, at p. 26).

Although the issue is not directly before us, we briefly consider it to give guidance to the commission on remand, and to avoid repetitious appeals.

The DRA asserted before the commission that SoCalGas's notes from the phone conference, which SoCalGas produced in response to the request for discovery from the DRA, show that SoCalGas voluntarily revealed enough information about the documents that the DRA requested to constitute a waiver under section 912 of the Evidence Code. The notes revealed that, in response to a question from the DRA during the meeting about why SoCal-Gas could not walk away from the contract, one of SoCalGas's representatives explained that "our attorneys had gone over the contract several times. There is no way we could legally cancel the contract and we would be subject to a lawsuit."

The question is whether SoCalGas's disclosure constituted a " 'significant part of [its] communications.' " (*Travelers Ins. Companies* v. *Superior Court* (1983) 143 Cal.App.3d 436, 444 [191 Cal.Rptr. 871].) Merely revealing that one has consulted an attorney is not enough to waive the privilege. (*Mitchell* v. *Superior Court, supra,* 37 Cal.3d 591, 603.) On the other hand, as noted in the commission's decision, revealing a *significant* part of the communication constitutes a waiver. (*Julrick Productions, Inc.* v. *Chester* (1974) 38 Cal.App.3d 807, 811 [113 Cal.Rptr. 527].) What is not clear is whether revealing the fact *and* the conclusion of a communication is sufficient to qualify as a waiver of the privilege. An analysis of the case law addressing

---

[20] Evidence Code section 912 provides in relevant part: "[T]he right of any person to claim a privilege provided by section 954 [lawyer-client privilege], . . . is waived with respect to a communication protected by such privilege if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege."

this question leads to the conclusion that no statutory waiver occurred in this case.

In *Travelers Ins. Companies* v. *Superior Court, supra,* 143 Cal.App.3d 436, it was argued that the holder of the attorney-client privilege had waived the privilege by signing answers to interrogatories. In holding that the signing of the answers did not constitute a waiver, the Court of Appeal observed: "The answer turns, of course, on determination of whether Klein's answers were wide enough in scope and deep enough in substance to constitute a significant part of the communication. We think not. His answers were, at most, preliminary and foundational—and quite vague. He did not provide the specifics the interrogatories were doubtless intended to produce. Any really significant part of the communication required by the statute remained unsupplied. . . . [W]e conclude that Klein's conduct in his answers did not reach that certain point of disclosure, [at which] fairness requires that his privilege shall cease whether he intended that result or not. [Citation]." (*Id.* at pp. 444-445, internal quotation marks omitted.)

Recently, in *Mitchell* v. *Superior Court, supra*, 37 Cal.3d 591, plaintiffs brought an action against several entities who manufactured, marketed, and distributed the chemical dibromochloropropane (DBCP), alleging contamination of the ground water near their home and seeking damages for the intentional infliction of emotional distress, accompanied by personal injuries, property damage, and other monetary losses. In response to an interrogatory and in answer to subsequent questions at her deposition, one plaintiff stated she had discussed DBCP with her attorney. Defendants sought to elicit details about the nature and content of any warnings, information or documents she received from her attorneys regarding the health effects of DBCP. Plaintiffs' attorney invoked the attorney-client privilege and instructed plaintiff not to answer. The superior court granted defendants' motion for an order to compel answers to these questions.

This court issued a writ of mandate ordering the superior court to vacate its order compelling discovery. The court held that the information sought by defendants clearly fell within the purview of the attorney-client privilege. This court further held that the individual plaintiff, when she stated that she had discussed DBCP with her attorneys, did not waive the privilege under Evidence Code section 912 by disclosing a "significant part of the communication." Finally, the court held that, under the circumstances, public policy considerations weighed ultimately in favor of preserving the attorney-client privilege.

In a more recent case, *Transamerica Title Ins. Co.* v. *Superior Court, supra*, 188 Cal.App.3d 1047, Transamerica Title Insurance Company

(Transamerica) was sued by Bank of the West, which alleged, among other things, that Transamerica had breached its title insurance contract and had acted in bad faith.[21] Transamerica cross-complained for declaratory relief as to the bad faith action. In response to an interrogatory asking whether Transamerica was relying on advice of counsel in connection with its handling of the bank's claim, Transamerica responded that it had sought the advice of counsel and that counsel had recommended that a declaratory relief action be instituted. Transamerica attached a copy of counsel's advice letter to the answer to the interrogatory. The bank then sought discovery of all memoranda relating to legal advice given Transamerica on the bad faith action. Transamerica refused to produce, claiming that the memoranda were privileged.

Transamerica sought review of the trial court's order granting the bank's request for discovery of all notes, memoranda, and other documents relating to legal advice given to the title insurance company concerning the bad faith action. The Court of Appeal directed the trial court to deny the bank's motion to compel production of privileged communications. The court held that, in responding to an interrogatory of the bank by attaching a copy of a letter from its attorneys recommending the initiation of the declaratory relief action, the title insurance company had not statutorily waived the attorney-client privilege. (*Transamerica Title Ins. Co., supra*, 188 Cal.App.3d at p. 1053.) The court rejected the bank's argument that Transamerica's disclosure of its attorneys' advice contained in the letter disclosed a significant part of Transamerica's communications with its lawyers concerning the litigation. In view of Transamerica's concession to limit its advice-of-counsel defense only to explain the filing of its cross-actions for declaratory relief, the court reasoned that disclosure would not significantly further the bank's case, but would surely impinge on Transamerica's ability to communicate freely and openly with its attorneys regarding the ongoing lawsuit.

Jefferson's California Evidence Benchbook offers an example, the principle of which applies here: "In *People* v. *Gardner* (1980) [106 Cal.App.3d 882 (165 Cal.Rptr. 415)], D, a defendant in custody, wrote a letter to the public defender in which he confessed a murder but cleared X and Y who were also arrested for the murder. D told X that he had written a letter to the public defender that would exonerate X and Y. X then told PO, a police officer, what D had said. PO searched defendant's cell, and seized the letter. At defendant's trial, over his claim of the lawyer-client privilege, the trial judge admitted D's letter. This was held to be reversible error. The People

---

[21] Bank of the West made a claim on a title insurance policy issued by Transamerica. The claim was denied and Bank of the West sued.

contended that the privilege had been waived by D's disclosure to X. *The Gardner court correctly held that the oral statement of D to X was not a disclosure of the contents of the letter, since it was limited to the fact that D had written a letter exonerating X and Y, but did not include any statement of X that D had confessed his guilt in the letter.*

■ "*Gardner* stands for the proposition that a disclosure by a client that he has made a communication to his lawyer about a particular subject is not a disclosure of a significant part of the *content* of such communication, which is the disclosure required for a waiver of the privilege under Evid. Code, § 912." (2 Jefferson, Cal. Evidence Benchbook, *supra*, § 35.1, pp. 1307-1308 (first italics added).)

We have considered these authorities and find their reasoning compelling. The attorney-client privilege seeks to protect the conversations and communications between the attorney and client, not merely the conclusions developed by those conversations or the fact that such conversations occurred. Accordingly, we conclude that SoCalGas's disclosure of the fact of its attorneys' review of the Getty agreement and the conclusions arrived at by its attorneys to members of the commission was not an express waiver of the attorney-client privilege.

The record does not support the existence of a statutory waiver of the privilege. SoCalGas's rate relief application sought recovery of certain costs incurred in buying out a contract SoCalGas desired not to perform. SoCalGas sought advice of counsel in this matter, who found no way that SoCalGas could unilaterally terminate the contract without being subject to liability. Cognizant of this, the SoCalGas management chose to buy out the contract, thereby avoiding litigation expenses and a possible adverse judgment. Counsel's opinion on contract enforceability was mentioned during the informal negotiation conference with the commission's staff.

The commission implies that SoCalGas's mention of its attorneys' advice disclosed a significant part of SoCalGas's communications to its lawyers concerning the litigation. We do not agree. SoCalGas stated that it had consulted its attorneys about the potential for terminating the contract. SoCalGas did not reveal the specific content of its communications with its counsel. While SoCalGas's opinion was based at least in part on its consultation with its attorneys, SoCalGas's disclosure shows no more than the fact that SoCalGas consulted counsel and drew its own conclusions from these consultations.

We conclude that SoCalGas has not revealed enough substantive information to hold that it waived its privilege and to require it to reveal the 15 documents prepared by its attorneys regarding the contract.

III.  *Conclusion*

We hold that the attorney-client privilege applies to the commission's proceeding and that the commission exceeded its authority by holding that SoCalGas impliedly waived its attorney-client privilege. The commission failed to show that SoCalGas placed in issue privileged communications, or that the privileged information is essential for a fair adjudication of SoCalGas's application.

The commission's decision requiring Southern California Gas Company to either produce documents prepared by its attorneys related to its buyout of the Getty contract or withdraw its CAM application is vacated.

Lucas, C. J., Mosk, J., Panelli, J., Eagleson, J., Kaufman, J., and Kennard, J., concurred.